## Franklin *against* Low & Swartwout, Administrators of Bauman.

No action will lie against the executors or administrators of a postmaster for bank notes stolen by one his *clerks* out of a letter delivered at the post-office. Could an action be maintained against the post-master himself if living ? *quere.*

THIS was an action of *assumpsit* for money had and received by the intestate. Plea, general issue. The cause was tried at the *New-York* sittings, the 23d *April*, 1805, before Mr. Justice *Thompson*, when the jury, by consent, found a verdict for the plaintiff, subject to the opinion of the court on the following case.

On the 13th day of *May*, 1803, the agent of the plaintiff put into the post-office, at *New-York*, a letter directed to the plaintiff at *Providence*, in the state of *Rhode-Island*, where he resided, containing eight hundred dollars, in bank notes issued by the bank of the *United States*. At that time, and long before, and afterwards, *Sebastian Bauman*, the deceased intestate, was the postmaster at *New-York*, and had the charge of the post-office in that city. On the 13th day of *May*, and before that time, one *Burlridge* was employed by *Bauman*, as a clerk in the post-office, and was hired and paid by him ; and on the same day the letter was broken open, and the money embezzled by *Burlridge.*

*Bauman* was appointed postmaster of the city of *New-York*, by the postmaster-general of the *United States*. All the postmasters receive from the postmaster-general, with their appointments, printed instructions for the government of their respective offices. In the instructions given to the intestate, it was directed that every assistant and clerk, employed in the post-office, should take an oath for the faithful performance of the duties required of him, which was to be certified and sent to the postmaster-general; and that the postmaster was to be answerable for the fidelity and care of every person employed by him; and he was to suffer no person, unless employed by him, to inspect or handle any letters, newspapers, or other articles which might come under his charge. The intestate took no bond or other security from the said clerk for the faithful execution of his duty; nor did it appear from any evidence offered, that he had taken the oath of office prescribed by the instructions of the postmaster-general.

ALBANY,
August, 1806.

Franklin
v.
Low & Swartwout.

It was agreed that in case the court should be of opinion that the plaintiff was not entitled to recover, then a judgment of nonsuit should be entered, otherwise the verdict was to stand, and the plaintiff to be entitled to judgment. No objection was to be made to the form of action.

*Bogert*, for the plaintiff. The present is a case of the first impression arising under the act of congress for the establishment of the post-office. Two cases have been decided in *England*, which may be thought applicable to the present: that of *Lane v. Cotton*,[*] decided in the time of Chief Justice *Holt*; and that of *Whitfield* v. *Lord Despencer*,[†] decided by Lord Chief Justice *Mansfield*. The correctness of those decisions may not only be questioned; but it will be found, on comparison, that there is a material difference between them and the one now before the court. In *England*, by the statute of 9 *Anne*, for erecting a general post-office, a postmaster general is appointed by patent, who is required to appoint inferior of-

* *Ld. Raymond,* 646.
† *Cowper,* 754.

ficers, clerks, sorters, &c.   All the inferior officers are appointed in the king's name, give security to, and are paid by, the *Receiver-general*, and not by the postmaster-general, who is expressly exempted by the act from any responsibility for the officers so appointed, being liable only for his own voluntary defaults and misfeasances.   Those inferior officers are, therefore, the servants and agents of the government.   By the act of congress, the *postmasters*, or deputies of the postmaster-general, are not obliged to employ *clerks* or *sorters* of letters.   If the postmaster employ clerks in his office, he must pay them ; they are his servants; there is no privity between them and the postmaster-general, or the government.   By his instructions it is expressly stated, that he alone is to be answerable for the conduct of the persons he may think proper to employ. He is required only to administer an oath to such persons, previous to their entering on the discharge of their duties. His clerks, therefore, must be considered as ordinary servants to whom he pays wages, and for whose conduct he is responsible as in other cases.   They give no security to government ; nor are they paid by government.   The provisions of the act of the *United States** are wholly unlike those found in the British statutes ; and decisions on the latter, ought not to govern the determination of cases arising on the former.   In the case of *Lane* v. *Cotton,* Lord *Holt* dissented from the rest of the court, who determined against the liability of the defendant; but the opinion of *Holt* has been deemed by respectable writers the better opinion.†  *Powys,* J. held that an action would lie against *Br ese,* the receiver of letters in the general post-office.   Unless, therefore, the decisions of the English court, though founded on English statutes, are regarded as conclusive and binding authorities in this case, the plaintiff, on general principles, is entitled to recover.

An objection will perhaps be made that this suit will not lie against executors or administrators.   In  the case

* 4 vol. *Laws*
U. S. p. 105.

† *Jones' Law of*
*Bailments,* 110.

ALBANY,
August, 1806.

Franklin
v.
Low & Swart-
wout.

* *Cowper*, 371.

*Hambly* v. *Trott*,* the distinction between what actions will survive, and what die with the person, is expressed with great clearness. Wherever the cause of action is money due, or a contract to be performed, or gain, or acquisition by the labour, or property of another, or on a promise expressed or implied by the testator, the action survives against his executors; otherwise, if it be a *tort*, or arise *ex delicto*, or supposed to be by *force* or against the peace. Here the action is for money received by the defendant or by his agent, which is the same thing, under an implied contract to deliver it according to its direction. It is a question of property. It is agreed by the case that no objection is to be made as to the *form* of action, or the *pleadings*.

*Harison*, for the defendants. Whatever difference may be found to exist between the English statute and our act, it will not vary the merits of the case. By the act of the *United States*, *postmasters* are appointed by the postmaster-general, take oaths, and give bonds, and hold their offices during pleasure, as in England. There may be some difference in regard to the *sorters* of letters. An action like the present could not certainly be sustained in England against the postmaster-general; and the deputy postmasters must be considered as standing on the same ground. The case of *Lane* v. *Cotton*, was against the postmaster-general, for exchequer bills delivered to a deputy under the act; and three judges against *Holt* decided that he was not liable. Though the great learning and talents of the Lord Chief Justice entitle him to very high and merited respect, yet his name alone is not to outweigh the rest of the judges, supported as their decision is, by the unanimous opinion of the court in a subsequent case, as delivered by Lord *Mansfield*. *Powys*, J. to be sure, throws out the idea that an action would have lain against *Breese*; but Chief Justice *Holt* very justly observes, that if *Breese* took out the bills he would be

liable as a *tort-feasor*. Lord *Mansfield*, in the case of *Whitfield* v. *Ld. Despencer*, considered the law as well laid down in *Cotton* v. *Lane*, in 1701, and as having been acquiesced in, and considered as the law, by all classes of people since that period. The circumstance of the office being patent in England, and the oaths and bonds required, can make no difference in the case. They are matters merely between the government and its agents, and intended as a security to the former; and are not to be brought into a consideration of this question. The decisions in England have proceeded on the broad basis of public policy and convenience. The most convenient, and the only practicable rule is, that the public officer should not be answerable for the misconduct of others; leaving to the parties injured their remedies against the immediate *tort-feasors*.

The neglect of *Bauman* to administer the oath to his clerk, might render him liable to the government, but not to third persons. The instructions, it is true, say that he shall be responsible for the acts of his servants. But to whom? To the government; not to the rest of the world. Further, it has been decided that a steward or manager of an estate, appointed by the court of chancery, was not liable for any damage done by those employed by him in the service of his principal; but that the actino must be brought against the person who did the injury or the principal. No action will lie against the intermediate agent.*

* 6 Term, 411.
Stone v. Cart-
wright.

But admitting that *Bauman* would have been liable in his life time, no action can be maintained against his administrators. To sustain *assumpsit* for money had and received to the use of the plaintiff, it ought to be shown that the money actually came to the use of *Bauman*, which is not pretended. *Trover* will not lie; and if it be a *tort* in *Bauman*, the right of action died with him. The plaintiff must resort to the clerk, the immediate *tort-feasor*.

*Hoffman*, in reply. ·The postmaster is bound to forward all letters received in his office, and if he fail to do so, it is a breach of his duty ; and an action of *assumpsit* will lie against him, on the implied contract, for a neglect or breach of his official duty. In this respect the receiving the letter and money, and not forwarding them, though by a clerk in the office, must be considered as the act of the master.

In the case of *Lane* v. *Cotton*, the action was brought against the *postmaster-general*, who did not appoint or pay the inferior officers. Here the action is against a deputy who appoints and pays his own servants. In England, all the officers have *fixed* salaries. In this country, the deputy postmasters are allowed a commission on all letters received. They have no salary, but so much per *cent* on what they receive. In England, the embezzlement would be *felony*, in which the contract would be merged. Here it is only a misdemeanour. On principles of policy, it is of importance that postmasters should be made liable, as it will render them more vigilant and faithful, more careful in the choice of their servants, and more attentive to their conduct. On the general principles of law, in relation to bailments, there is nothing to distinguish this case from that of any *carrier for hire.* If a private individual should set up a post-office, and undertake to carry letters for hire, there would be no doubt of his liability, in such a case. Because the government has thought proper to establish a general post-office, and draw a revenue from the carriage of letters, why should the *obligations* of parties be varied, or individuals be rendered less *secure* in the transmission of letters than they would have been before such an establishment? Why limit the responsibility of the postmaster for the acts of his servants solely to government? It concerns the public at large. The language of his instructions is, you may execute the duties of your office personally, or employ clerks, but if you em-

3 G

ALBANY,
August, 1806.

Franklin
v.
Low & Swart-
wout.

ploy clerks, you must be answerable for their acts. He can take adequate security for the good behaviour of his servants, and thereby protect himself and the rest of the world against the consequences of their misconduct.

SPENCER, J. The only question in this case is, whether any suit can be maintained against the representatives of a deceased postmaster, for the embezzlement of money by a clerk in the office, by taking the same out of a letter deposited in the office for transportation by the mail.

I think that this action is not maintainable against the representatives. I avoid giving any opinion whether the principal, if alive, would be responsible for the fidelity of the clerk, either under the particular circumstances of this case, or on general grounds. It is a general and universal proposition that personal actions founded in tort, or for misfeasance, die with the person. That this cause of action arises *ex delicto* cannot be controverted; no action would lie on an assumpsit, because, though the clerk received the money, it was taken feloniously and contrary to his duty and trust; it never came to the hands of the intestate.* The regular form of declaring would be on the misfeasance of the clerk, and the only plea would be not guilty. There is not in my recollection an instance of assumpsit having been brought in a case like the present. From a variety of cases which confirm the position that this action cannot be maintained against the representatives of a party, I will cite only those of *Hambly* v. *Trott*† and *Baily* v. *Births & Wife*.‡ In the case first cited, Lord *Mansfield* considered the plea of not guilty as decisive. That was an action of trover, and though his lordship considered it substantially an action founded on property, it was held not to lie. He says, " if it is a sort of " injury by which the offender acquires no gain to himself " at the expense of the sufferer, then the only reparation " is, for the *delictum* in damages to be assessed by a ju-" ry, but where, besides the crime, property is acquired

* 3 *Wils.* 429,
443. 1 *B. &
Puller,* 404, &c.
1 *East,* 106.
6 *Term,* 125.
1 *Salk.* 282.
The cases in
*Salk.* & 1 *B. &
Puller* state the
ground on
which the
master is liable.
† *Cowper,* 371.
‡ *T. Ray.* 72.

" which benefits the testator, there an action shall survive
" against the executor, as for instance, the executor shall
" not be chargeable for the injury done by cutting down
" another's trees, but for the benefit arising to his testator
" for the value or sale of the trees he shall." The case
cited from Sir *T. Raymond*, goes further. It was an ac-
tion on the case ; the declaration stated the plaintiff to have
been possessed of a cow, which he delivered to the defend-
ant's testator to keep in his pasture for the plaintiff, and
to be re-delivered to him, but which he sold, and convert-
ed, and disposed of the money to his own use; the plea
was not guilty ; the jury found for the plaintiff, and the
judgment was arrested on the ground that it was a *tort*
with which the executor ought not to be charged. This
case is cited by Lord *Mansfield* in the case of *Hambly &
Trott* with approbation. It is agreed, in all the books, that
an action does not lie against the representatives of a sheriff
for an escape, whether suffered by himself or his deputy,
and the reasons are, that the form of action requires a
plea of not guilty, and that the guilt of a deceased per-
son is tried, and that the assets are not benefited. Whe-
ther originally the law was wisely established is not for
me to inquire ; it is sufficient for me, that it is e stablish-
ed, and that we are bound to pronounce it. The plain-
tiff must be nonsuited.

KENT, C. J. THOMPSON, J. and TOMPKINS, J. concurred.

LIVINGSTON, J. This case is very distinguishable
from those that were cited. In *Lane* v. *Cotton & Frank-* 1 *Ld Ray.* 646.
*land*, there was an express provision in the patent, con-
stituting the defendants postmasters-general, " that they
" should not be chargeable to account for the mismanage-
" ment or default of their inferior officers, but only for
" their own voluntary defaults." Though I should have
supposed that this was intended only as a protection
against the government's calling on them for such defaults,
it is a clause which is relied on in giving judgment. It is
also considered as a circumstance in favour of the defend-

ants that their reward was settled, and not depending, as here, on the number of letters carried; but even in that case *Holt* was in favour of their liability; and so, probably, would the other judges have been, if the defendants had taken the office as the intestate did here, on the express condition, as stated in the instructions, of being responsible for the " fidelity of his agents." It is highly reasonable that this should be so, for such liability will greatly increase the security of the public, not only by preventing collusions between the principals and their servants, but by rendering the former more circumspect in their choice, more watchful over their clerks, and, particularly, more attentive in taking bonds for their faithful conduct. It may, it is true, now and then, fall hard on a postmaster; but it is better it should be so than that individuals should be without remedy for injuries committed by their agents.

But if a cause of action ever existed, it died, it is said, with the intestate; though this was not strongly insisted on. To go through all the cases which have sprung from the maxim of *actio personalis moritur cum persona* would tend, as Lord *Mansfield* says, " rather to confound than " elucidate." If literally applied, not even debt, or assumpsit would lie against executors on a note or bond of their testator. This, however, is not its construction; for courts, finding the inconvenience of being frequently called upon to apply a maxim, the generality of whose language is well calculated to mislead, have endeavoured to restrain it within reasonable bounds. In England, therefore, if the suit, which is brought, does not require a plea of *not guilty*, it will generally be sustained. It must, and ever will, remain incomprehensible to one of common discernment only, why this criterion has been adopted as a test of an executor's liability, rather than the intrinsic merits of the plaintiff's demand. Shall a man carry away the goods, or convert the property of another, or defraud him to any extent, or injure him by his negli-

gence, and his estate not be answerable, because no ac-
tion but that of trespass, trover, deceit, or some such will
lie, the general issue in all which is *not guilty* ? In a case
of bankruptcy,\* we refused to put a defendant's respon-
sibility to so precarious a test, but looked at the real cause
of action, which we considered as barred by the discharge,
though a plea of not guilty might properly have been
interposed. Without, however, interfering with any ad-
judged case, it may safely be said, consistently too with
the case of *Hambly* v. *Trott*,† that wherever there be a
*contract* expressed or implied, and that on a valuable
consideration, from which a benefit has, or might have re-
sulted to the testator, for the faithful conduct of a third
person, an action will lie against his executors on the
contract, whether the breach alleged be a *tort*, or any
other misconduct of the party. Such is the case here. A
postmaster accepts an office, highly beneficial ; and, in con-
sideration of such advantages, assumes a responsibility
for his clerks. If this be the situation of a postmaster,
it would be easy and right to sue him, or his executors in
a special action on the case on his contract, for the mis-
feasance of his clerk, which would drive the defendant to
his plea of *non-assumpsit*, and relieve the case from
the difficulty that would arise from the plea of *not
guilty*. Though a *tort* in the clerk, it is on his *contract*
that the postmaster is liable ; and accordingly, it was the o-
pinion of *Gould*, in the case cited, that " if any thing could
" support this action, it must be a contract expressed or
" implied." If an action, then, can be brought on the
contract, as I think it can, there is an end of all the diffi-
culty about the plea. The plaintiff, in my opinion, is en-
titled to judgment.

*Judgment of nonsuit.*

ALBANY,
August, 1806.

\* *Ante*, p 37.
*Hatten* v. *Spey-
er.*

† *Cowper*, 371